Charles E. MILLER, Jr., et al., Plaintiffs,

v.

SCHOOL DISTRICT NUMBER 2, CLARENDON COUNTY, SOUTH CAROLINA, a public body corporate, et al., Defendants.

Civ. A. No. 8752.

United States District Court
D. South Carolina,
Charleston Division.

April 21, 1966.

Matthew J. Perry, Lincoln C. Jenkins, Jr., Columbia, S. C., Ernest A. Finney, Jr., Sumter, S. C., Jack Greenberg, New York City, Nicholas deB. Katzenbach, John Doar, Washington, D. C., Terrell L. Glenn, Columbia, S. C., Frank M. Dunbaugh, Washington, D. C., for plaintiffs.

D. W. Robinson, II, Columbia, S. C., and Joseph O. Rogers, Jr., and Marion S. Riggs, Manning, S. C., for defendants.

HEMPHILL, District Judge.

Plaintiffs, Negro children attending in defendant school district, instituted this action August 17, 1965 pleading jurisdiction under 28 U.S.C. 1343(3), alleging: "this being a suit in equity authorized by law, Title 42, United States Code, Section 1983 [1] * * * to redress the deprivation, under color of statute, ordinance, regulation, custom or usage of a state, or rights, privileges and immunities secured by the Constitution and laws of the United States." By Order of February 18, 1966, the United States was allowed to intervene and thereafter spearheaded the cause of plaintiffs.

The seed of the difficulty is that "the Public School Systems of School District Number 2, Clarendon County, South Carolina, is now and has been in the past a dual school system based on race.[2] The fruits of its germination and growth, plaintiffs allege, has been the unconstitutional deprivation of the rights of members of the Negro race in the district. They now seek a decree permanently enjoining the defendants from:

1. Operating a compulsory bi-racial school system;

2. Continuing to maintain a dual scheme or pattern of school zone lines or attendance area lines based on race or color;

3. Assigning pupils to schools on the basis of race and color of the pupils;

4. Assigning teachers, principals and other professional school personnel to schools on the basis of the race and color of the person to be assigned and the race and color of the children attending the school to which such personnel are to be assigned and

5. Approving budgets, making available funds, approving employment and construction contracts, and approving policies, curricula and programs which are designed to perpetuate or maintain or support compulsory segregated schools.

By their answer of September 13, 1965 [3] defendants allege inter alia:

Defendants instituted a policy providing for and authorizing the transfer of pupils among the various schools of the School District in response to the Civil Rights Act of 1964 and said transfer and assignment shall be without regards to race, color or national origin of a pupil or of the pupil's parent.

\* \* \* \* \* \*

[P]laintiffs made application for the school year 1965–66 to the School District for admission to the Manning Elementary and High School both of which schools have been attended heretofore by the children of the white race \* \* \*.

[T]he applications for transfer or reassignment of the Plaintiffs were reviewed by the Defendants. Each Plaintiff's previous academic work together with the supervising principal's comments on each individual pupil were carefully considered by the Defendants \* \* \* [I]n each case the transcript of the pupil's academic rec-

1. Civil action for deprivation of rights. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity. or other proper proceeding for redress.

2. Stipulated on pre-trial, p. 10, Transcript.

3. Upon intervention the court allowed the answer to stand as answer to the intervenor.

ord and/or the principal's comment indicated, without question, the inadvisability of making the requested transfer and this decision was made without regard to the race, color or national origin of the pupil.

[T]o grant the requested transfers on the grounds of the pupil's "right" to attend a particular school would have discarded every educational, humane, and moral criteria, and this the Defendants decline to do. The Defendants earnestly submit to the Court that the transfer of Plaintiffs would have been injurious to their educational process and violative of the Defendant's duty.

&ast; &ast; &ast; &ast; &ast; &ast;

They deny the racial discrimination of which plaintiffs complain. Defendants also insist that the facts alleged in the complaint do not justify consideration of this as a class action under Rule 23(a) (3) [4] Federal Rules of Civil Procedure.

■ We consider that contention here on the necessary assumption that plaintiffs have made it believing in its merit and that it in some manner bears on the outcome. Similar cases have, however, been brought with uniformity as class actions and we see nothing here to distinguish the present case. In Brunson v. Board of Trustees of School District No. 1 of Clarendon County, South Carolina, 311 F.2d 107 (4th Cir. 1962) cert. denied 373 U.S. 933, 83 S.Ct. 1538, 10 L.Ed.2d 690 (1963) the United States Court of Appeals for the Fourth Circuit found error in an Order of the District Court which struck from the complaint all the plaintiffs save the first named. They held that common questions of fact were presented and that the plaintiffs were entitled to join in one action under Federal Rule of Civil Procedure 23(a) (3): "Whether the School Board is assigning pupils involuntarily, on the basis of race is a question of fact which is common to all of these objecting plaintiffs." In an action to enjoin school authorities from refusing admission to school, failure of the lower court to rule that it was a class action was held error. Gantt v. Clemson Agricultural College of South Carolina, 320 F.2d 611 (4th Cir. 1963) cert. denied 375 U.S. 874, 84 S.Ct. 46, 11 L.Ed.2d 49 (1963). "The action was brought by the plaintiff not only for his own benefit, but on behalf of other Negro citizens &ast; &ast; &ast; similarly situated. This procedure is entirely proper under Rule 23(a) (3) &ast; &ast; &ast;." Id. at 614. See, e. g., Harris v. Bullock County Board of Education, 232 F.Supp. 959 (M.D.Ala.1964). We find that the complaint here represents on its face questions of law or fact common to all on whose behalf the suit is brought. This determination is not affected by the subsequent stipulations of fact.

Attached to the Answer, as Exhibit "A" thereof is a document of the district's present policy.

## PLAN FOR PUPIL ASSIGNMENT, TRANSFER AND RE-ASSIGNMENT IN COMPLIANCE WITH CIVIL RIGHTS ACT OF 1964 FOR SCHOOL DISTRICT NUMBER 2, CLARENDON COUNTY, SOUTH CAROLINA

*Whereas* the Congress of the United States has enacted into Law H.R. 7152 on July 2, 1964 which act is cited as the "Civil Rights Act of 1964" and *Whereas* Title Four Desegregation of Public Education prohibits the operation of Public Educational Institutions

---

4. Rule 23(a) (3): Class Actions (a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is &ast; &ast; &ast;
(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought.

on a basis which recognizes race in any of its aspects and *Whereas* it is the intention and desire of the Trustees to comply with all duly enacted laws as being the foundation of all democratic States and *Notwithstanding* the fact that the Trustees verily believe that a mass change in the operation of the Public Schools will be disruptive and generally harmful to the cause of education and are particularly convinced that educational criteria must be the over-riding consideration in all well regulated educational institutions; Do provide the following procedures:

(1) Beginning with the school year 1966–67 this School District will receive applications for assignment of pupils originally enrolling in the school system without regard to the race, color or national origin of the pupil or its parent and will process these applications in like manner.

(2) That beginning with the school year 1966–67 any pupil heretofore enrolled in the schools of this District and desiring to attend another school within the District will be given a full, free and unrestrictive opportunity to make this selection and such request will be received and acted upon without regard to the race, color or national origin of the pupil, its parent or the fact that the school selected may have been attended by pupils of another race prior thereto.

(3) That the Trustees of this District shall cause to be given during the month of July, 1966 (or earlier if the same be administratively desirable) notice to the parents or guardians of all pupils presently attending school in School District Number 2, of Clarendon County, South Carolina, that the assignment or transfer request may be made and where and to whom they should be made.

I. That the applications above referred to will be processed and acted upon by the Trustees of this District without regard to the race, color or national origin of the pupil or its parent and solely upon the following criteria:

(1) The preference indicated by the pupil's application.

(2) Whether the educational program of the pupil can be met by the school to which assignment is sought.

(3) The capacity of the school to which assignment is sought.

(4) The availability of space in schools other than the school from which and to which entry is sought.

(5) The distance the pupil lives from such school.

II. Wherever a pupil or its parent does not indicate a preference under the plan above referred to the pupil shall be assigned to the school which it attended the preceeding [sic] year.

III. A sufficient notice to convey the policy outlined hereinabove shall be printed in The Manning Times, a newspaper of great circulation in Clarendon County, and School District Number 2 for three consecutive weeks prior to July 30, 1966.

IV. Application forms necessary for any pupil to avail themselves of the policies outlined hereinabove shall be available in the Office of the District Superintendent during normal working hours during the period which the notice provided herein shall be published.

V. All applications received pursuant to this policy will be acted upon as quickly as possible and the applicant shall be notified of the Board's decisions forthwith. Any parent or guardian aggrieved by any decision by this Board hereunder will upon application to the Board be granted a personal hearing in connection therewith.

The foregoing was duly adopted by the Board of Trustees of School District Number 2 of Clarendon County

as a policy of this Board by a unanimous vote.

R. E. Wells, Jr., Chairman

James E. Gamble

Leroy O. Phillips

Ralph W. Bleasdale

T. Boyd Rhame

ATTEST:

W. H. Weldon

W. H. Weldon, Superintendent
School District Number 2.

This court finds the following facts in this case.

– 1 –

In School District Number 2, Clarendon County, South Carolina every aspect, every facet, of school planning, administration, operation, policy, and practice, has, by design and purpose, racial characteristics. This includes, among others, the fact that students, teachers, staff personnel, and the curricula with its related and unrelated activities now captive of an active plan to complete and maintain separation of the races. White and Negro simply do not receive the equal treatment. There is no credible evidence of a bona fide attempt to comply with Brown v. Board of Education of Topeka.[5]

The school district facilities for Negro students are inferior to those for white students. The per pupil value of the buildings, land, and equipment in use for white students is much greater than that for Negro students. This is evident from information and statistics furnished by the defendants which shows per pupil value of the White School system to be $1,006.58 and the corresponding value of the Negro system to be $394.18.

– 2 –

The 1962–63 school year current expenses were $305.91 per white student; $119.89 per Negro student. Thus the per pupil expenditure reveals planned, and accomplished, discrimination.

– 3 –

Wide differences between the salaries of white teachers and Negro teachers continue to exist. Only white teachers teach in the white schools. Only Negro teachers teach in the Negro schools.

The per pupil expenditures for instructional materials for white pupils exceed that for the Negro pupils by a ratio of eight to one. Other per pupil expense comparisons are similarly disproportionate. It is a fact that each Negro pupil in the district's school system is denied a "fair share" of the funds expended for all purposes in the district schools.

– 4 –

Educational opportunities for Negro students are inferior to those available to white students:

Library facilities are fewer in number, and inferior in both quality and quantity of materials.

The language departments of the white schools are equipped with special training apparatuses. The Negro schools are not.

The available training aids for the commerce courses are inferior in the Negro schools by number and by quality.

That Negro students are not offered the same courses as white students is clearly demonstrated by the variances in curriculum.

The Negro school lunch program and facilities suffer by comparison with the white.

The Negro teachers have lower ratings (based on National Teachers' Examination results) than white teachers, yet they are burdened with heavier class loads.

The white high school has a band. The Negro school does not.

Separate athletic facilities are so different in quality and appointments as to be almost beyond comparison.

All of these are cogent evidence that equality of opportunity does not, and cannot, exist. It is perhaps not surprising that comparatively fewer Negroes

---

5.  347 U.S. 483, 74 S.Ct. 686, 93 L.Ed. 873 (1954).

have entered college, and it is just as obvious that those who have entered were not as well prepared.

— 5 —

The white schools are accredited. Not only are many of the Negro schools unaccredited but not one of the five Negro elementary schools have even applied for accreditation. Principal personnel of only the Negro schools were shackled with additional duties.

— 6 —

The responsibility for the operation, maintenance, and administration of the school system in the district rests solely on the defendants. They possessed the *authority*, if not the will, to eliminate racial discrimination.

The dual system of Clarendon County School District Number 2, based on race, and constantly generating racism as a byproduct, cannot continue to exist if all citizens are to have the equal protection of law. The Supreme Court expressed this inescapable conclusion.

[T]he fundamental principle [is] that racial discrimination in public education is unconstitutional * * *. All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle.[6]

The Fourth Circuit Court of Appeals in Bradley v. School Board of City of Richmond, 345 F.2d 310 (4th Cir. 196), indicated approval of a school attendance plan "when it gives to every pupil an unrestricted right to attend the school of his choice, or that of his parents." Under no view of the instant case can it be said that the plan gives an unrestricted right. At best it is merely a contrived "paper tiger" hopefully remaining within the "letter of the law" but perpetuating discrimination.

The plan now in existence contains several criteria which operate as a limit to unrestrictive choice. It provides that considerations for transfers will be based solely on the following factors:

(1) The preference indicated by the pupils application.

(2) Whether the educational program of the pupil can be met by the school to which assignment is sought.

(3) The capacity of the school to which assignment is sought.

(4) The availability of space in schools other than the school from which and to which entry is sought.

(5) The distance the pupil lives from such school.

This court does not attempt a point by point analysis, rejection or acceptance, and recommendation of the plan. The result of such a process would be a dictation. An examination of the major pitfalls left open by this plan will demonstrate that the plan fails in its mission and, hopefully, will indicate the path to be taken.

The present plan excludes parental choice under all circumstances.

The present plan presents a time schedule for the giving of notice that transfer requests may be made, and the procedure for making them, that is beyond the time limits suggested by the Department of Health, Education and Welfare. What the procedure shall be is not delineated in the present plan.

The plan presents methods for the dissemination of notice and procedure— which shall presumably embrace the proper forms for the exercise of choice— which are inadequate.

There is no provision in the plan for the mandatory exercise of free choice by all pupils annually. The ills attending a voluntary choice plan are patent. This is particularly true in this case where a student who does not exercise a choice will be assigned to the school he previously attended. The possibilities presented for the perpetuation of the status quo by this combination are obvious. Viewed

6. Brown v. Board of Education of Topeka, 349 U.S. 294, 298, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

in the most benign light it is a needless temptation for further evasion.

The plan fails to explain the procedures that are to be followed in establishing priorities of preference. The plan, however, would make the "availability of space in schools other than the school from which and to which entry is sought" and "the distance the pupil lives from school" factors for consideration in processing the applications. These limitations are not consonant with the *Bradley* concept of unrestricted freedom.

The recent "Revised Statement Of Policies For School Desegregation Plans Under Title VI Of The Civil Rights Act Of 1964," published in March of 1966 by the Department of Health, Education and Welfare, sets out standards for the adoption of a freedom of choice plan. Those standards have been adopted and approved generally in other forums in this Circuit.[7] The orderly progress of desegregation is best served if school systems desegregating under court order are required to meet the minimum standards promulgated for systems that desegregate voluntarily. Without directing absolute adherence to the "Revised Statement" guidelines at this juncture, this court will welcome their inclusion in any new, amended, or substitute plan which may be adopted and submitted.

Bradley v. School Board of City of Richmond pointed out that "[o]nly experience will show whether the so-called plan represents a real change in the officials' attitude toward their consitutional duty, or merely a strategic retreat to a new position behind which the forces of opposition will regroup." The characteristics of the pattern at hand alert one to the wisdom of that admonition. The credible evidence in this case, and the inferences adduced, reveal that the proposed plan was not designed to effect any change, nor did it have the integrity of good intention. Racial discrimination has been practiced in the district in every way which the plaintiffs complain of. It is elementary that there has been a denial of constitutional rights to the plaintiff class.

The court examined the record in this case in view of the fact that a dual school system based on race was, and remains, the system employed in the district. Whether the defendants were under the misimpression, or merely entertained the hope, that the "separate but equal" doctrine was tenable until court action was instituted is not clear. Under the tradition of that doctrine Negro students have been deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment and even those of limited education are now informed that the doctrine is no longer law. The Supreme Court expressed the necessity of educational progress in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691 (1954):

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

PROCEDURE TO BE FOLLOWED

Defendants, their individual, collective successors in office, responsibility and/or

---

7. See Kier v. County School Board of Augusta County, Virginia, Western District of Virginia, 249 F.Supp. 239, decided January 5, 1966 and Wright v. County School Board of Greensville, Virginia, Eastern District of Virginia, 252 F.Supp. 378, decided January 27, 1966.

authority are hereby and herewith enjoined from, and directed to cease:

1. Operating a compulsory bi-racial school system;

2. Continuing to maintain a dual scheme or pattern of school zone lines or attendance area lines based on race or color;

3. Assigning pupils to schools on the basis of race and color of the pupils;

4. Assigning teachers, principals and other professional school personnel to schools on the basis of the race and color of the person to be assigned and the race and color of the children attending the school to which such personnel are to be assigned and

5. Approving budgets, making available funds, approving employment and construction contracts, and approving policies, curricula and programs which are designed to perpetuate or maintain or support compulsory segregated schools.

Defendants, individually and collectively, and their successors in office shall substitute for, supplement, amend, or replace its pupil assignment plan to correct the constitutional deprivation to plaintiff and their class, noted and discussed herein. This will be done with convenient speed so that defendants shall, individually and collectively, file with this court on or before May 15, 1966 a statement of intention to comply together with listed, actual, plans for compliance. This statement shall contain such information as will assure full compliance herewith at the beginning of, and throughout, the school term commencing in September 1966.[8]

This court, appreciative of the difficulties involved, mindful of time not used in the past for accomplishment, *expects* individuals and officials to continue in office, pursue in good faith. Any individual or collective attempt to delay unnecessarily will find no sanction here.

And it is so ordered.

---

8. September is used as the month; nothing herein prevents commencement of normal school year in August or October.