**Charles E. MILLER et al., Plaintiffs,**

and

**United States of America, by Nicholas deB. Katzenbach, Attorney General, Plaintiff-Intervenor,**

v.

**SCHOOL DISTRICT NUMBER 2, CLARENDON COUNTY, SOUTH CAROLINA, a public body corporate et al., Defendants.**

**Civ. A. No. 8752.**

United States District Court
D. South Carolina,
Charleston Division.

June 14, 1966.

See also D.C., 253 F.Supp. 552.

Matthew J. Perry, and Lincoln C. Jenkins, Jr., Columbia, S. C., Ernest A. Finney, Jr., Sumter, S. C., Jack Greenberg, New York City, Nicholas deB. Katzenbach, James W. Phillips, Washington, D. C., Terrell L. Glenn, Columbia, S. C., for plaintiffs.

D. W. Robinson, Columbia, S. C., Joseph O. Rogers, and Marion S. Riggs, Manning, S. C., for defendants.

HEMPHILL, District Judge.

This court, continuing its jurisdiction, scheduled a hearing at Florence, S. C. May 16, 1966 pursuant to its order of April 21, 1966 that "defendants shall individually and collectively, file with this court on or before May 15, 1966 a statement of intention to comply * * *" with that order. The order directed defendants to correct all aspects of the public school establishment in that district which operated to deprive the plaintiff class of rights guaranteed by the Constitution of the United States. At the same time the court considered a motion for rehearing and amendment of the court's ruling of April 21.

Filed with the Clerk of Court, District of South Carolina, May 12, 1966 were the minutes of the Board of Trustees of defendant School District. The minutes, which are as follows, contain the revised desegregation plans for the School District:

MINUTES OF MEETING OF THE
 BOARD OF TRUSTEES OF
 SCHOOL DISTRICT #2, CLARENDON COUNTY, SOUTH CAROLINA

2 May 66

On motion of Mr. Bleasdale seconded by Mr. Herlong and unanimously adopt-

ed, the Board, in compliance with the directions of the United States District Court as expressed in its Order of April 21, 1966 in Miller vs. School District No. 2, C/A 8752 [253 F.Supp. 552], adopts the following as its pupil assignment plan in lieu of the plan heretofore adopted.

Beginning with the school year 1966–67 the assignment of pupils seeking enrollment in School District No. 2 in an elementary school for the first time, or any junior or senior high school for the first time, shall be made without regard to race, color or creed, and shall be made with every practical expedition; the Board will consider the following criteria:

A. (1) Preference indicated by the pupils' application; (2) Whether the educational program of the pupil can be met by the school to which assignment is sought; (3) Capacity of the school to which assignment is sought; (4) The availability of space in the schools other than the school from which and to which entry is sought; (5) The distance the pupil lives from such school; (6) The attendance zone in which pupil lives;

B. When transfer of preference cannot be honored because of administrative difficulties, pupils shall be assigned to the school which they attended the preceding year, except those eligible for promotion to a different school. Notwithstanding, however, and as a matter of absolute right, application may be made for the parent or legal guardian of such pupils for placement in another school specified in the application therefor, in which case the reason for the requested transfer must be stated. Such application shall be considered under the direction of the Superintendent and acted upon in the light of all the criteria set forth

in paragraph "A" hereinabove without regard to race, color, or creed within 30 days from date received.

C. For the school year beginning in August or September, 1966, application for initial assignment, as well as applications for transfers must be made on forms to be provided and received by the District Superintendent's Office prior to July 1, 1966. Application forms shall be available in the Office of the Superintendent of School District No. Two beginning June 1, 1966, and may be obtained upon request of any applicant to the principal of any school. Official forms only shall be used, and they shall be delivered only to pupils, parents, legal guardians, or persons in loco parentis.

D. Application forms to be used on behalf of pupils establishing residence in Clarendon County School District No. Two after June 1, 1966, will be available in the Office of the Superintendent, and should be filed with the District Superintendent on behalf of such pupils as soon as practicable. All applications shall be considered under the direction of the Superintendent and acted upon within 30 days, under the criteria set forth in paragraph "A" hereof.

E. All other rules and regulations and administrative procedures heretofore existing with respect to assignment, enrollment, and transfer of pupils in said School District shall conform with the requirements as herein stated.

F. The Superintendent is directed to mail by regular United States mail, on or before June 1, 1966, to the parent or guardian of each child presently enrolled in School District No. Two, unless the child is finishing school in June 1966, and to the parent or guardian of each child preparing to enter any of the schools for the term beginning in August or

September 1966, a letter reading as follows:

"Every child in School District Number 2 school system has the right to attend a school freely selected without regard to race or color. Parents' requests for initial assignment or transfer of pupils in order to attend a school with members of the other race will be freely granted. If your child is entering school for the first time, you may present the child for enrollment at any school serving the child's grade level without regard to whether the school you choose is or was formerly attended solely by Negro pupils or solely by white pupils. If your child is now assigned to an all-Negro or an all-white school, and you desire that the child be transferred to another school in order to obtain a desegregated education, you should indicate this desire on this notice in the space provided and re-turn it to your child's present teacher or principal.

"Your choice of schools should be filed on or before July 1, 1966 on forms, available on and after June 1, 1966 in the Office of the Superintendent of Schools, Manning, S. C."

G. The Superintendent is also directed to publish in Manning Times the procedures and criteria for pupil assignment as set out in this plan. These procedures shall be published once a week for three weeks beginning on or about May 25, 1966.

H. In subsequent school years the same procedures shall be followed except that May 1st shall be the date for sending the letter to the parents and the date after which forms shall be available in the Superintendent's office, that the newspaper publications shall begin on or about April 15th and the time for filing choice forms shall be on or before June 1st.

| /s/ W. K. Herlong | /s/ R. E. Well, Jr. |
| /s/ James E. Gamble | /s/ Ralph W. Bleasdale |
| /s/ T. Boyd Rhame | |

Plaintiff and Intervenor complain that the new plan as presented in the minutes is substantially the same as the old and will not effect a change in the present status, that being "The Public School System of School District Number 2, Clarendon County, South Carolina, is now and has been in the past a dual school system based on race."[1]

The order of April 21, 1966 to which the defendants now respond proffered to the defendants a standard of compliance with the order. The court there said

The orderly progress of desegregation is best served if school systems desegregating under court order are required to meet the minimum standards promulgated for systems that desegregate voluntarily. Without directing absolute adherence to the "Revised Statement" guidelines at this juncture, this court will welcome their inclusion in any new, amended, or substitute plan which may be adopted and submitted.

The standard there adduced recognized that the "Revised Statement" guidelines propounded by the Secretary of Health, Education and Welfare (1) are not here of binding legal effect and (2) they are a recommended minimal compliance (though they may be considered the height of idealism by those that oppose them) which have not been subjected to debate and tested by advocacy in this court[2] and may not therefore fall with

---

1. See Order of April 21, 1966 Footnote 2 —(The finding is undisputed and was admitted on pre-trial stipulation of fact).

2. Every opportunity has been given defendants for voicing objections to the "Revised Statement" guidelines with specificity. The record will show that they have chosen to address their arguments to other points.

precision into each particular situation. That effort by the court at restraint and flexibility was not directed to allow a local situation to override settled principles of constitutional law, but that the local school administrators and officials might step forward with the minor modifications (if any), and the tools, and lubricants to make the machinery of constitutional justice work with a minimum of discordant rumblings and unharmonious vibration. The new proposal was but little changed, it is obvious, from the original plan. The plaintiff points out that it is even more restrictive than before.

Defendants through their able counsel have expressed to the court their good faith, their ready will to comply, the high purpose and endeavor with which they have faced the task; but the proposal forwarded implies the standard of reasonableness was either too obscure or somehow repugnant to them. The court stands ready to assist the defendants in their efforts in the first contingency, for it has been assured by defendants' counsel that there is agreement as to our goals and no disagreement to the means.

The order of April 21, 1966 pointed out that the plan as it was then proposed failed by not providing for parental choice under some circumstances, and that it failed in not providing for mandatory annual exercise of free choice. The new plan does not cure those shortcomings. At the hearing every opportunity was offered to the defendants to articulate a rationale for their position.

Court: Let's go through and see what objections your people have. Do your people have any objection to *every* student either in person or through his parents *making an annual choice.*

Counsel: No, sir. We tried to provide it in here and we thought we had.

The old plan failed, as was pointed out in the order, in that it pre-

sented methods for the dissemination of notice and procedure which were inadequate. The new plan does not cure that fault.

Court: You have no objection to public notice?

Counsel: No, sir. We provide in here both advertisement and notice to the parents.

Court: All right, sir. You have no objection to the mailing of the plan to the student instead of his coming to—(the officiary).

Counsel: If your Honor thinks that is better.

The defendants point out that, though they do not agree that the physical facilities of the Negro and white schools are significantly unequal, the inequality cannot work a discrimination because now the students are to have the free choice of schools. This argument will be robbed of even a shred of meaning unless that freedom of choice is real, unrestricted and universal. The annual mandatory exercise of free choice is a salutary and expeditious means to effect those essential qualities. The defendants have voiced no objection to that method. The procedures for exercising that choice should be designed so that there is no unnecessary restriction upon it. Choice should be an exercise of the will—not a successful stratagem of administrative chess.

The proposed new plan requires that the parents indicate their desire that their child be transferred to another school giving the reason for the transfer on the letter of notice which is to be mailed to them. The actual exercise of choice forms are only to be made available upon request at the office of the Superintendent of School District No. Two. Official forms only are to be used, and they shall be delivered only to pupils, parents, legal guardians, or persons in loco parentis.

The defendant's plan speaks of "administrative difficulty." It is a non-specific

idea but it is part of our common knowledge that in organizations dealing with large numbers of people "administrative difficulties" both large and small abound. There must be method, procedures, and organization. But these are of little intrinsic worth. They are but the means to achieve. Our purposes should not be limited or perverted by them. If as they are set forth they are intended to minimize difficulty, to expedite, to economize, then who would object. They should not operate, however, to summarily dispose of applications on technicalities.

The plan should provide that the receipt of a single exercise of choice should be sufficient for consideration. It should provide that any "form" would be acceptable that is intelligible and apprises the officiary of the name of the student, that he has exercised a choice, and what the choice is. The burden is small; the benefits are great. The forms officially recommended and furnished should be made readily available to the general public. In the twelve years that have passed since the Supreme Court of the United States passed down the decision in Brown v. Board of Education[3] children of the plaintiff class have completed the entire grade range of public education. Many have since come to parenthood. There are in the land various individuals and organizations devoted to the civil rights movement. It is easy to point out the excesses of those whose zeal may be misguided. It is wholly unconstructive to deny the help of the worthy to those parents who as a result of inferior education may be ill prepared to help their children. Assisting children into non-discriminatory educational processes serves a noble purpose from whatever quarter.

 The implementation of a freedom of choice plan presents the greatest problem, perhaps, in the matter of priority in registration at the school chosen. The problem inheres wherever one school cannot accommodate all those who wish to attend. It is not the exclusive concomitant of a desegregation plan. Addressing attention to the proposed new plan of preference considerations:

A(1) Preference indicated by the pupil's application;

A(2) Whether the educational program of the pupil can be met by the school to which assignment is sought.

It is self evident that the educational program of the student is to be chosen by the student. It is not a ponderable point. The criteria is valid to the extent that certain training, perhaps vocational or preparatory, may be centered in one school or another due to economic or other pragmatic considerations. In the same manner the practice of separating study groups or classes into accelerated or slow sections is a matter for educators. "Discrimination" bears no stigma in connotation. It is "racial discrimination" in public education which must be excised here from the American culture.

A(3) Capacity of the school to which assignment is sought;

A criteria of physical fact which loses any objectionable quality when it is applied to all equally under the mandatory annual exercise of choice.

A(4) The availability of space in the schools other than the school from which and to which entry is sought;

For students now in schools which they do not desire to attend, the availability of space in any other school could prevent their admittance to the school of their choice. Under a voluntary exercise of choice plan this would separate the students into "haves" and "have nots"—those who are satisfied where they are and "have" their choice, and those who wish to elect another school and "have not" their choice. The burden of exercising free choice then falls unequally on the latter who must occupy other available

3. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

space before that which he chooses. Under a mandatory exercise of choice plan this consideration should fall equally upon all students. Of what does it avail in that case? A(4) is not a logical criteria for the consideration of preferences for the school of first choice. There is but one valid reason to deny a student's choice. That reason is that there is not enough space available in the school to which entry is sought. When more students select a school than the school can accommodate, criteria

> A(5) The distance the pupil lives from such school.—is the governing factor in establishing preference of entry.

■ A(6) The attendance zone in which pupil lives.—introduced in the new plan, without further specification brings to mind, and reluctantly so, the spectre of gerrymandering: Quick reflection on the avowed good faih and high purposes of the defendants dispels the thought with dispatch. In an integral school district, attendance zones aligned with the distance the pupil lives from the school (see citeria A(5)) may serve useful administrative purposes, but as a consideration for preferences of choice it would seem that proximity to school is the greater consideration and it swallows the lesser. Attendance zones are unnecessary in preference considerations. They were not included in the original plan and shall not be included at this late hour.

■ The proposed new plan provides: "B. When transfer or preference cannot be honored because of administrative difficulties, pupils shall be assigned to the school which they attended the preceding year * * *." The same considerations that obtain in the consideration of first choice continue to obtain though the student may be overcrowded and underdistanced out of the school of his choice. The student should be notified, and, for students of all colors tend to lighter pursuits at the end of the day,

the parent should be notified in writing that the choice has been denied. In that notice the student should be given a second choice of the remaining schools having space available in his grade. The clerical burden, again, cannot match the benefit.

The court has been assured that no undue influence or harassment, will be forthcoming from official or school administration.

■ Provision should be made in the plan for reconsideration, after initial assignment, of applications for transfer based on special need of the student. The request should be in writing and should clearly set forth for consideration the special circumstances creating the need.

■ The new plan as proposed would implement the plan only at the entry grade of elementary, junior high, and high schools. The press of time for the oncoming school year is of course of some urgency, but does it match the urgency felt by the high school freshman who has three most valuable and critical years in front of him? It is inappropriate to take half-steps at this time. The plan will be implemented in all grades.

The decision in Brown v. Board of Education was interpreted with the high legal acumen of the remand court in Briggs v. Elliott [4] as follows:

> It has not decided that the states must mix persons of different races in the school or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly * * *.[5]

There was also enunciated in Brown a great constitutional principle which cannot now—twelve years later—be denied. The Attorney General of the United

4. 132 F.Supp. 776 (E.D.S.C.1955) (per curiam 3 Judge Court).

5. Id. at 777.

States speaking as the Chief Counsel of the United States has commented: [6]

The road leading away from Brown has been marked by an unending series of "detour," "falling rocks," and "limited access" signs. The guideposts have been read too often as loose metaphors rather than imperatives for action. "All deliberate speed" and "gradualism" have been invoked in ways suggesting the slow erosion of the ocean tides or the natural movements of a glacier * * *.

* * * [W]hen vigorous challenges degenerate into dilatory tactics, they can be destructive and endanger the public order. Law is not a synonym for litigation. Yet when the law of the land persistently is held to be no more than the law of the case; when members of the legal profession continue to contest the major holdings of the Brown decision on the suggestion that they may yet be reversed, then we court breakdown in our legal system.

In *Brown* the Court approached the matter of granting relief in practical rather than narrow terms: [7]

In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. * * * At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision.

In the process of transition from a dual school system to a desegregated school system, a sense of duty and re-

sponsibility with an eye to realities will make manifest to all the need to equalize disparity in equipment which must now serve all. The point has been raised that there is no discrimination where a student is free to choose the best school in the district. Where all the students cannot be admitted into the better segment of a system some must necessarily do the best they are able where they can be admitted. All efforts should therefore be made to bring to a reasonable parity all the schools in the district.

■ If in the wisdom and provision of the school establishment there should be offered educational and allied programs beyond the grade schools, such as adult education courses, or pre-school activities, they shall be made available to all eligible participants without regard to race, creed, color, or national origin.

■ Because the weaknesses of a dual school system may have already affected many children, the court would be remiss in its duty if any desegregation plan were approved which did not provide for remedial education courses. They shall be included in the plan. The court is mindful that such programs may be an added expense. Without prescribing any method of financing, the court calls attention to the privileges assured in this field by the provisions of Title IV of the Civil Rights Act of 1964. Section 403 [8] provides:

The Commissioner is authorized, upon the application of any school board, State, municipality, school district, or other governmental unit legally responsible for operating a public school or schools, to render technical assistance to such applicant in the preparation, adoption, and implementation of plans for the desegregation of public schools. Such technical assistance may, among other activities, include making available to such agencies information re-

---

6. Law Day Address at the University of South Carolina Law School, Nicholas deB. Katzenbach, Attorney General of the United States, April 28, 1966.

7. Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

8. 42 U.S.C.A. § 2000c–2 (1964).

garding effective methods of copying with special educational problems occasioned by desegregation, and making available to such agencies personnel of the Office of Education or other persons specially equipped to advise and assist them in coping with such problems.

Section 405 [9] provides:

(a) The Commissioner is authorized, upon application of a school board, to make grants to such board to pay, in whole or in part, the cost of—

(1) giving to teachers and other school personnel inservice training in dealing with problems incident to desegregation, and

(2) employing specialists to advise in problems incident to desegregation.

(b) In determining whether to make a grant, and in fixing the amount thereof and the terms and conditions on which it will be made, the Commissioner shall take into consideration the amount available for grants under this section and the other applications which are pending before him; the financial condition of the applicant and the other resources available to it; the nature, extent, and gravity of its problems incident to desegregation; and such other factors as he finds relevant.

The court has received assurances that in this school district no discrimination in the placement and elevation of teachers exists. In view of the admission that the entire school structure has been based on a dual system that assertion must rest entirely on the fact that no teacher has instituted suit. The Fourth Circuit has recently reiterated the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), that consideration of race in faculty selection is forbidden just as it is in pupil selection. Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. decided June 6, 1966). The issue here is not whether there must be employed a Negro teacher in a white school, but whether faculty segregation works a discrimination in the education of the plaintiff pupils. The evils of the involuntary segregation of the teachers will not be lost on the pupils. A desegregation plan ought to encompass the orderly and efficient elimination of all vestiges of racial discrimination in the utilization of faculty. The Supreme Court, in Bradley v. School Board, 382 U.S. 103, 105, 86 S.Ct. 224, 15 L.Ed.2d 187 (1966), said "there is no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plan is entirely speculative." The implication brings a question. Many desegregation plans have included provisions for faculty desegregation. Kier v. County School Board of Augusta County, Va., 249 F.Supp. 239 (W.D.Va. January 5, 1966); Bell v. School Board of City of Staunton, Va., 249 F.Supp. 249 (W.D.Va. January 5, 1966); Wright v. County School Board of Greensville County, Va., 252 F.Supp. 378 (E.D.Va. Jan. 27, 1966); Turner v. County School Board of Goochland County, Va., 252 F.Supp. 578 (E.D. Va. Jan. 27, 1966); Thompson v. County School Board of Greensville County, Va., 252 F.Supp. 546 (E.D.Va. Jan. 27, 1966). The question whether a school desegregation plan can be approved without adequate provision for desegregation of faculty is presently pending in the Fourth Circuit in Wheeler v. Durham City Board of Education, No. 10,460 [363 F.2d 738]. In the transitional period, during which the court retains jurisdiction, this order shall be subject to amendment in order to conform the plan to the resolution of the issues now pending in Wheeler v. Durham City School Board.

The court does not deign to state the obvious to the knowing. It is not from pedantry that these elemental truths are stated here, but that there may be a statement, indisputably clear, that the plaintiffs may know what is to be done for them, and that they may know of the spirit and the will of the Board of Trustees of Clarendon County School District

9. 42 U.S.C.A. § 2000c–4 (1964).

Number Two to afford the equal protection of the laws to all of its citizens.

The path to be taken should now be clear. The plans submitted to date do not suffice. The principles set forth and approved in this order shall be the guide to action. The administrative procedures which may be developed to effectuate these principles shall not deflect their purpose nor derogate from their spirit. The procedures for complying with this order shall be initiated and shall continue according to the schedule that has been agreed upon for the oncoming school year and the schedule that has been agreed to for all succeeding years.

This court retains jurisdiction throughout the transitional period. The termination of the period shall be determined by the court on petition of either party, showing satisfactory completion. Appropriate reports will be submitted to the court by the Board of Trustees periodically throughout that period.

And it is so ordered.