Roberta **RANDALL**, Louise Randall and William Randall, minors, by James E. Randall, their Father and next friend, et al., Plaintiffs,

v.

**SUMTER SCHOOL DISTRICT NUMBER 2, SUMTER, SOUTH CAROLINA,** a public body corporate, and Dan L. Reynolds, etc., et al., Defendants.

Civ. A. No. AC–1240.

United States District Court
E. D. South Carolina,
Columbia Division.

April 23, 1965.

Matthew J. Perry, Columbia, S. C., for plaintiffs.

Shepard K. Nash, Sumter, S. C., for defendants.

HEMPHILL, Chief Judge.

Defendants' petition for modification of this Court's Order of August 8, 1964, granting original plaintiffs' injunctive relief and ordering their admittance at schools previously all white, and generally ordering desegregation in the schools of defendants[1]. Their contention is that the *practicality* of administration requires that considerable flexibility be a part and parcel of the authority and the responsibility of defendants in carrying out the Court Order.

This Court emphasizes, and reiterates, that defendants shall conform to the meaning and substance of the original order, as modified, the remaining plaintiffs heretofore admitted shall, if they desire, continue in the school or schools to which they were admitted, and defendants shall not refuse admission, continued education, or transfer of *any* pupil in the district on the basis of race, creed, or color. This Court will not countenance any action of any of the parties hereto which will effect subterfuge, chaos, avoidance of this Order or abuse of it, or delay. All parties have able counsel, officers of this Court, on whom this Court depends to counsel, advise, and direct compliance with this and other Orders of the Court herein.

Since the May 17, 1954 decision of Brown v. Board of Education[2], the United States District Courts have had a mandate of authority and direction, supervised and monitored by the various United States Courts of Appeals, in school desegregation cases. In this State the Darlington County[3], Charleston County[4], Orangeburg County[5] cases, among others, have been before the United States District Courts of South Carolina, and we find the usual pattern of decision ordering the formation and presentation of a "plan" of desegregation sufficient for the abolition of discrimination in enrollment, transfer, placement, or continuing education of pupils in the public schools. The subject of school desegregation has, for more than ten years, generated a fertile field for litigation, a sounding board for political demagogery, avenue after avenue of abuse frequented by some of sincerity, others who would destroy America by destroying her schools in the name of education or "rights", but in purpose racism traveling in the vehicle of righteousness. In such a setting this case arose.

This Court, in its endeavor to follow the "Law of The Land" as propounded by the highest court of last resort, and the directives and interpretations of the Fourth Circuit Court of Appeals, nurses the hope of orderly process, orderly application, orderly cooperation. No one court can hope to uncover, much less solve, the complexities of the issues in this controversial field[6]. It finds good

---

1. Randall v. Sumter School District Number 2, Sumter, South Carolina, 232 F. Supp. 786 (E.D.S.C.1964).

2. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

3. Not published.

4. Brown v. School Dist. No. 20, Charleston, S.C., 226 F.Supp. 819 (E.D.S.C.); affd. 328 F.2d 618 (4th Cir. 1964).

5. Adams v. School Dist. No. 5, Orangeburg County, S.C., 232 F.Supp. 692 (E.D. S.C.1964).

6. For erudition this Court has reviewed, intensely, the excellent article "Racial Imbalance in the Public Schools: the Constitutional Concepts," by Owen M. Fiss, 78 Harvard Law Review 564 (1965).

fortune in the guidance displayed in four recent cases from the Fourth Circuit [7].

This Court will not abandon the sacred legal bulwarks of *stare decisis* in treating the problems, current, or on the horizon of expectation, but it cannot *ignore* the signs of the times, nor can justice hide its head in the sand. A revolution has taken place in the field of race relations, particularly in the area of desegregation of schools, and the significant and praiseworthy acceptance of the inevitable, as well as the "test" students, at the University of South Carolina, Clemson University [8], and other State Schools, bespeaks our progress, as a State, in race relations. This Court, without advising a course of pursuit outside official orders, takes judicial notice of the fact that more than 80 per cent of the 108 school districts in South Carolina have forwarded Civil Rights compliance plans to the Office of Education of the Department of Health, Education and Welfare. The Court is mindful of the difficulties involved, acutely conscious, at the same time, of the *necessity* of schools, the best if possible, in South Carolina. In the political arenas, the awareness of the problems is refreshing:

"To use fixed racial quotas in the assignment of students, as is now being tried in some metropolitan centers, does not appear a sound and workable solution. In assigning students on the basis of such quotas, the constitutional principle that race is not a legitimate factor for determining school assignment is actually being violated. The Constitution is color-blind; it should no more be violated to attempt integration than to preserve segregation. This does not mean that a community can be blind to the racial composition of its schools, or that it should fail to strive for the best educational environment; one that in cutting across economic, cultural, and racial lines exposes the student to a microcosm of our society. Quota assignment, however, involving as it does the massive transportation of students from white to nonwhite areas, and vice versa, can do little more than exacerbate the problem. At best, it can provide only a temporary solution.

"Actually, desegregation through quota assignment plans is limited much less by the expense of transporting students than it is by the deeply entrenched concept of neighborhood schools. The long struggle, not yet complete, to reorganize our one-room rural schools into larger systems, even with the more adequate educational program such change would assure, is proof of the neighborhood concept's persistence. Parents are in fact apt to prefer changes in the community's housing pattern rather than assignment of their children—especially small children—to a school in a part of the city distant from home" [9].

From the treatise above quoted we excerpt from the discussion upon Aaron v. Cooper [10].

"Under such circumstances, the District Courts were directed to require 'a prompt and reasonable start

7. Gilliam v. School Board of City of Hopewell, Va., 345 F.2d 325 (4th Cir. 1965) (2 cases): Nesbit v. Statesville City Board of Education, 345 F.2d 333 (4th Cir. 1965); Bowditch v. Buncombe County Board of Education, 345 F.2d 329 (4th Cir. 1965); and Bradley v. The School Board of City of Richmond, Virginia, 345 F.2d 310 (4th Cir. 1965). All of these cases, decided on April 7, 1965, were heard by the Court of Appeals sitting *en banc*, opinions by Chief Judge Haynsworth.

8. See Gantt v. Clemson Agricultural College of S. C., 320 F.2d 611, cert. den. 375 U.S. 814, 84 S.Ct. 46, 11 L.Ed.2d 49.

9. From "School Desegregation: Documents and Commentaries," Edited by Hubert H. Humphrey (now Vice Pres.), (1964 Ed.) p. 3.

10. See D.C., 163 F.Supp. 13; 8 Cir., 257 F.2d 33, and 357 U.S. 566, 78 S.Ct. 1189, 2 L.Ed.2d 1544.

toward full compliance,' and to take such action as was necessary to bring about the end of racial segregation in the public schools 'with all deliberate speed.' Ibid. Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the courts should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practicable completion of desegregation, and had taken appropriate steps to put their program into effective operation. It was made plain that delay in any guise in order to deny the constitutional rights of Negro children could not be countenanced, and that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance. State authorities were thus duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system."

In the Richmond Case, supra, the Court emphasized the necessity of *continuing* the existence of an *unrestricted freedom of choice in selection of schools*, repeating the rule:

"It has been held again and again, however, that the Fourteenth Amendment prohibition is not against segregation as such. The proscription is against discrimination."

The Court went on to say:

"A system of free transfers is an acceptable device for achieving a legal desegregation of schools. Its acceptability is not dependent upon the concurrent use of some other device which also might be adequate. In this circuit, we do require the elimination of discrimination from initial assignments as a condition of approval of a free transfer plan. Imposed discrimination is eliminated as readily by a plan under which each pupil initially assigns himself as he pleases as by a plan under which he is involuntarily assigned on a geographic basis."

Perhaps, in the case before this Court, it might be well to use the language of the separate concurring and dissenting opinion of Circuit Judge Sobeloff and Bell:

"Only experience will show whether the so-called plan represents a real change in the officials' attitude toward their constitutional duty, or merely a strategic retreat to a new position behind which the forces of opposition will re-group."

The United States Court for the Eastern District of South Carolina *expects* good faith in approving a modification of the previous order. Affirmative action is the order of the day.

As Judge Haynsworth noted in Nesbit v. Statesville City Board of Education, supra, at page 335 of 345 F.2d:

"Undoubtedly, there is a discretionary area within which a District Judge may allow some delay in full implementation of desegregation in some schools or grades. But permissible delay must arise out of administrative problems and operational difficulties, and the passage of time has contracted the discretionary area."

Plaintiffs here seek immediate desegregation, in entirety, of the Negro and white school populations involved here. Defendants predict chaos as the immediate result of such an attempt, much less

the accomplishment. Plaintiffs fail to convince this Court that such an objective could be justified at the cost of the destruction of the effective operation of the Sumter County Schools. As Dr. Fiss so well observed [11]:

> "*Correcting the Imbalance.*—The ultimate goal of all efforts aimed at correcting the imbalance is not the distribution of the Negro and white public school population so that in every school the proportion of Negro to white children will be precisely equal to the proportion of Negroes to whites in all the public schools of the same level in the community. The objective instead is negative: no school should be established or maintained that is predominantly Negro and in which the proportion of Negroes exceeds the proportion of Negroes enrolled in the public schools at the same level in the community. The phrase 'correcting the imbalance' is used to denote a continuous process of gradual steps toward the realization of this objective."

78 Harvard Law Rev. 654, 571.

With this thought in mind, this Court awaits action by defendants. Administrative delays reasonably generated by genuine difficulties will not be considered as activities or acts banned or prohibited in this Court's original Order; however, if lack of good faith and acts consistent therewith characterize defendants' conduct, then such conduct will be considered contumacious, and good cause will have to be shown why they should not be held in contempt. Defendants have room to maneuver, but they must be guided by the mandate of the Constitution.

This Court approves a modification of the Order made in this cause dated August 8, 1964 by eliminating paragraph 5 of the original Order (at the same time retaining paragraph 6 thereof) and substituting in lieu thereof the following:

"5. Beginning with the school year 1965–66, the assignment of pupils seeking enrollment in School District No. 2 in an elementary school for the first time, or any junior or senior high school for the first time, shall be made without regard to race, color or creed, and shall be made with every practical expedition; defendants may consider, for the purpose of orderly administration, but not as a vehicle for delay or avoidance, the following criteria:

"A. (1) Preference indicated by the pupils' application; (2) Whether the educational program of the pupil can be met by the school to which assignment is sought; (3) Capacity of the school to which assignment is sought; (4) The availability of space in the schools other than the school from which and to which entry is sought; (5) The distance the pupil lives from such school; (6) The attendance zone in which pupil lives;

"B. When transfer or preference cannot be honored because of administrative difficulties, pupils shall be assigned to the school which they attended the preceding year, except those eligible for promotion to a different school. Notwithstanding, however, and as a matter of absolute right, application may be made for the parent or legal guardian of such pupils for placement in another school specified in the application therefor, in which case the reason for the requested transfer must be stated. Such application shall be considered under the direction of the Superintendent and acted upon in the light of all the criteria set forth in paragraph 'A' herein above without regard to race, color, or creed within 30 days from date received.

"C. For the school year beginning in August or September, 1965, application for initial assignment, as well as applications for transfers,

---

11. See note 6, supra.

must be made on forms to be provided and received by the District Superintendent's Office prior to June 15, 1965. Application forms shall be available in the Office of the Superintendent of School District No. Two beginning May 1, 1965, and may be obtained upon request of any applicant to the principal of any school. Official forms only shall be used, and they shall be delivered only to pupils, parents, legal guardians, or persons in loco parentis.

"D. Application forms to be used on behalf of pupils establishing residence in Sumter County School District No. Two after May 1, 1965, will be available in the Office of the Superintendent, and should be filed with the District Superintendent on behalf of such pupils as soon as practicable. All applications shall be considered under the direction of the Superintendent and acted upon within 30 days, under the criteria set forth in paragraph 'A' hereof.

"E. All other rules and regulations and administrative procedures heretofore existing with respect to assignment, enrollment, and transfer of pupils in said School District shall conform with the requirements as herein stated."

The notice required in paragraph 6 of the Order of August 8, 1964 shall be published by defendants in a newspaper of general circulation in Sumter County once a week for three consecutive weeks, the first publication to be made not later than May 5, 1965.

In all other respects the Order of August 8, 1964, is reaffirmed herein. This Court awaits with hope, expectation, the implementation of its Orders, the accomplishment of desegregation by defendants.

And it is so ordered.