UNITED STATES of America, by Ramsey CLARK, Attorney General of the United States, Plaintiff,

v.

ELLOREE SCHOOL DISTRICT NUMBER 7, ORANGEBURG COUNTY, SOUTH CAROLINA, a public body corporate; Hugo L. Felkel, Chairman of the Board of Trustees of Elloree School District Number 7, Orangeburg County; C. Francis Martin, James Howard Shirer, Jakie Felder, and Jack Ford, Members of the Board of Trustees of Elloree School District Number 7, Orangeburg County, South Carolina; and M. G. Austin, Superintendent of Elloree School District Number 7, Orangeburg County, South Carolina, Defendants.

Civ. A. No. 67–628.

United States District Court
D. South Carolina,
Orangeburg Division.

April 3, 1968.

Klyde Robinson, U. S. Atty., Columbia, S. C., Frank E. Schwelb, Frank W. Hill, Robert B. Hocutt, Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Augustus T. Graydon, Graydon & Davis, Columbia, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

DONALD RUSSELL, District Judge.

Filed by the Attorney General under Section 407 of the Civil Rights Act of 1964[1] and supported by his certificate of the essential jurisdictional facts thereunder,[2] this action seeks the desegregation of the public schools maintained by the defendant school district.

---

1. Section 2000c–6, 42 U.S.C.A.

2. United States by Katzenbach v. Junction City School District No. 75 (D.C.Ark., 1966) 253 F.Supp. 766, 768.

The record herein is confined to the deposition of the district's superintendent, M. G. Austin, taken at the instance of the plaintiff, and certain exhibits produced and identified in the course of such deposition. This record establishes that the defendant herein, a public school district, organized under the laws of South Carolina, operates two public schools, separately housed, located about a mile apart, and each offering a full complement of elementary and high school grades. The division between elementary and high school is uniform in the two: 1 through 6 are classified as elementary, 7 through 12 as high school. Both schools serve the school population living within the geographical limits of the school district. Economically, the district is agricultural. Its population is about two-thirds Negro and one-third white.

Prior to the school year 1965–6, one of the schools operated by the defendant, known as the Elloree Training School, was all-Negro, both in faculty and student body; the other, designated as Elloree Public School, was all-white, in faculty and student body. Administratively, all Negro students enrolled were assigned to the Training School and similarly all white students to the Public School. Following the enactment of the Civil Rights Act of 1964, and by way of compliance therewith, the school district adopted for the school year 1965–6 a freedom of choice plan, under which the parents of a student were given the right within a fixed and limited time to apply in writing on a form furnished by the district for transfer of their child to either of the schools operated by the district. Absent such application, students were assigned to the school they attended the previous school year. This plan followed generally the plans being proposed by other school districts in this District and was approved by the Office of Education, H. E. W. The parents

of eighteen Negro students applied for transfer from the Training School to Elloree Public School under this original freedom-of-choice plan. Eleven of such applications were rejected for a variety of reasons. Several were denied because of poor grades, one because she was an unwed mother and three because of the failure of the parents to sign the request for transfer in time. Some of these reasons indicated an excessive and unreasonable zeal for administrative inflexibility. While the reasons given were not proper grounds in most instances for the denial of transfer, the good faith of the defendant in the action it took was not put in issue herein.[3]

The defendant has continued to operate its school system under this freedom-of-choice plan, unchanged except for the discontinuance, after the 1965–6 school year, of any denial administratively of a transfer on any ground other than the failure of the parents to sign the transfer application. Even this latter requirement was relaxed for the school year 1967–8, though it should be noted that this relaxation followed an inquiry by the FBI in April, 1966, into the operation of defendant's freedom-of-choice plan.

For the current school year 1967–8, 14 or 15 students sought transfer from the Training School to the Elloree Public School but only nine actually enrolled in the latter school. 591 of the students at the Training School and 287 of the students at the Public School indicated in writing their choice of school for attendance.

Considerable attention was focused by the plaintiff, during the examination of Mr. Austin, upon a comparison of the relative quality of the two school systems. It was agreed that the physical plants of the two schools are comparable. The Training School has 26 permanent classrooms, together with 3 mobile class-

**3.** Dissatisfied with the denial of transfer in certain cases, the Office of Education required the defendant to give a new opportunity to parents for applying for the transfer of their children and the defendant promptly complied.

rooms, just completed.[4] The enrollment in the Training School for the year 1966–7 was 888. South Carolina, however, has made quite a distinction between enrollment and average daily attendance. A teacher's load is determined not by the number of pupils on the roll but by those who actually attend class. Accordingly, all allocations of state aid for teachers' salaries are made on the basis of average daily attendance.[5] By like reasoning teaching loads should be measured in terms not of enrollment but of average daily attendance. In the elementary grades (1 through 6), student load at the Training School, calculated in terms of this average daily attendance, was 505 (as contrasted with an enrollment figure of 549) and in the high school was 305 (as contrasted with the enrollment figure of 339). 16 teachers staff the elementary grades at the Training School, with an average class load of just over 31 students, based on average daily attendance; in the high school, there is a like number of teachers, with an average class load of 19, again based on average daily attendance.

The Public School, on the other hand, has 15 classrooms. It has an enrollment of 182 in the elementary grades, with an average daily attendance of 179. There are 6 teachers for such elementary grades, with an average class load, based on average daily attendance, of approximately 30. In the high school, the enrollment figure is 154 and the average daily attendance is 155.[6] It has 11 teachers; with an average class load of 14, calculated on average daily attendance.

Summarized, these comparisons of the two schools operated by the defendant district are as follows:

|  | Training School | Public School |
|---|---|---|
| No. Enrolled in Elementary Grades | 549 | 182 |
| Average Daily Attendance in Elementary Grades | 505 | 179 |
| Teachers in Elementary Grades | 16 | 6 |
| Teacher Load Based on ADA | 31 | 30 |
| No. Enrolled in High School | 339 | 154 [6] |
| Average Daily Attendance in H. S. | 305 | 155 [6] |
| Teachers in H. S. | 16 | 11 |
| Teacher Load Based on ADA | 19 | 14 |

For purposes of state aid, teachers in South Carolina are graded by their scores attained on the National Teachers' Examination. Those with the higher level of scores (i. e., 500 or more) are graded "A" and those with lesser scores are given "B" and "C" certificates. At the Training School, there are two teachers with an "A" certificate, 18 with a "B" certificate and 6 with a "C" certificate. On the other hand, the Public School has 13 teachers with an "A" certificate and 2 with a "B" certificate. This variation in certificates has created naturally a variation in teachers' salaries in favor of teachers at the Public School. Reflecting this variation, Elloree Training School, on average, re-

4. There has been some over-crowding at the Training School. It was to relieve such condition that these mobile classrooms were installed.

5. Section 253, Title 21, Code of South Carolina (1962), as amended, July 1, 1964.

6. The inconsistency of these two figures is not noted or explained in the record. I have used the numbers as given in the exhibits, accepting the inconsistency therein.

ceived in annual state aid per teacher $4,160; Elloree Public School received $4,835. On the other hand, more teachers at the Training School have Master's Degrees than teachers at the Public School (i. e., 7 in the Training School and 1 in the Public School).

The applications for accreditation, submitted by the two schools on behalf of their respective high schools, were offered by the plaintiff as providing some basis for a comparison of the two schools.[7] Thus, in library facilities and support, the two schools are relatively equal. The Training School reports 15 library books per pupil as against 13 at the Public School.[8] At the Training School all teachers have earned "a Bachelor's degree or the equivalency certificate" but at the Public School one had not. No teacher at the Public School exceeded the standard teaching load. At the Training School, on the other hand, one carried more than the standard teaching load. The basic curriculum offerings at the two schools seemed largely similar, though the exercise of choice of elective subjects, largely accounting for the difference in course offerings, varied somewhat in the two schools. In the high school at the Public School, the courses offered totalled 33, as opposed to 29 at the Training School. One school had a substantial class in Business Mathematics, which was not duplicated in the other. In the eighth grade in one school, the science offering is General Science and in the other Earth Science. In the higher grades, Biology as a science elective is generally preferred over Chemistry in one school and the reverse in the other.

On the basis of their applications, supplemented by such additional inquiries as may have appeared appropriate, both high schools were duly accredited. In fact, Superintendent Austin testified that both had been accredited for many years. On the other hand, the elementary department at the Public School was accredited for the school year 1966–7 but apparently its application for accreditation for the year 1967–8 had been deferred because of certain deficiencies. At the Training School, application for accreditation of its elementary department was not made until the school year 1967–8;[9] its application was deferred because of deficiencies. Mr. Austin testified that the deficiencies in both elementary departments were roughly the same and were classified in both cases as "minor deficiencies".

In the past, teachers have been recruited and assigned on a basis which does not meet the constitutional standards. Recruitment of new teachers at both schools is along varied lines and no real effort has been made to assign teachers on a nonracial basis. Under the plan by which it is presently operating its schools, the defendant does not propose to change the method of recruiting and assigning teachers.

Unquestionably, there has been considerably more assistance given the athletic program at the Public School than at the Training School. The Public School maintains an active program in football, basketball, baseball and track. Basketball is the only organized sports program at the Training School. The limited program at the Training School

7. In the record, I was able to find the application of the Training School for the year beginning in 1967 and that of the Public School for 1966. It is assumed, however, that there is so little difference between the two years that a comparison on such basis is not inappropriate.

8. Mr. Austin gave the comparison as 9 books per pupil at the Training School and 13 at the Public School. These comparisons dealt with the schools as a whole. The comparison given above was

limited to the high schools, where library facilities are more important.

9. It should be borne in mind that while the accreditation of high schools has been in order for many years, elementary schools were first accredited in 1962–3. In the first year of accreditation, about 10 per cent of the elementary schools of the State were accredited and, as of the present school year, less than 50 per cent are accredited. Letter, March 27, 1968, Joel Taylor, State Elementary Supervisor.

is excused on the ground that athletic programs are expensive. It was inferred that the football program at the Public School was self-sustaining, though this was not established as a fact, and that such a program at the Training School would not be. Mr. Austin testified that the same athletic field was available to both schools. Actually, however, the Training School had used it rarely, if at all.

The defendant, by its answer, contended that, by adopting its freedom-of-choice plan, it had met the legal requirements for desegregation but, upon trial, conceded that such plan, as operated at the commencement of this action, did not conform with the criteria established in Bowman v. County School Board of Charles City County, Va. (C.C.A.4, 1967) 382 F.2d 326, and similar authorities in this Circuit, and expressed its willingness and intention to update its plan to meet such criteria. It accordingly proposed that the Court issue a decree substantially similar to that entered in the Whittenberg Case (Whittenberg v. Greenville County School District Civil Action No. 4396 filed March 10, 1967 (unreported)) which met the requirements stated by the Court of Appeals in the Bowman Case.

The plaintiff's position was that freedom of choice is not an appropriate remedy and sought a mandatory decree requiring the immediate discontinuance of the dual school system by the defendant and the consolidation of all elementary grades of both school systems into a single elementary school, housed in the present quarters of the Training School, and the consolidation of all high school grades into a single high school, housed in the present Public School building. For purposes of such consolidation, the plaintiff would include in the consolidated elementary school grades 1 to 8 and in the high school grades 9 to 12.

In cases such as this, contrary to the suggestion of the plaintiff, the remedy generally adopted in this District [10] and approved in this Circuit [11], has been a mandatory system of initial assignments on the basis of complete free choice followed by the annual right to exercise a choice as the student moves from one level to another. Such a remedy of free and uninhibited choice has been denominated in this Circuit as "an acceptable device for achieving a legal desegregation of schools." Bradley v. School Board of City of Richmond, Virginia (C.C.A.4, 1965) 345 F.2d 310, 318–319. And this conclusion of our own Circuit Court of Appeals seems in accord with the principles applied generally in federal courts in other Circuits. Raney v. Board of Education of Gould School District (C.C.A.8, 1967) 381 F.2d 252 and Monroe v. Board of Commissioners, City of Jackson, Tenn. (C.C.A.6, 1967) 380 F.2d 955.[12] It is true that, in United States v. Jefferson County Board of Education (C.C.A.5, 1966) 372 F.2d 836, aff. on rehearing en banc, 380 F.2d 385, "freedom of choice" as a term in semantics was given a verbal drubbing [13]

---

10. The bellwether case in this circuit is the definitive opinion of Chief Judge J. Robert Martin, Jr. in Whittenberg v. Greenville County School District (D.C. S.C.), filed March 10, 1967, unreported. See, also, among others, Miller v. School District No. 2, Clarendon County, S.C. (D.C.S.C., 1966) 256 F.Supp. 370, 374–375; Adams v. School District No. 5, Orangeburg County, S.C. (D.C.S.C., 1967) 271 F.Supp. 579.

11. In Bowman v. County School Board (C.C.A.4, 1967) 382 F.2d 326, 327, Chief Judge Haynsworth, in an unusually concise and clear opinion, stated the rule as to freedom-of-choice in this Circuit; see, also, Wheeler v. Durham City Board of Education (C.C.A.4, 1965) 346 F.2d 768, 773; Bradley v. School Board of City of Richmond, Virginia (C.C.A.4, 1965) 345 F.2d 310, 313, rev. on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187.

12. Certiorari has been granted in these cases, as well as in the companion case to the Bowman Case. Arguments thereon have been set for the present term.

13. See, also, the criticism of the term "freedom of choice" as a misnomer in 53 Va.Law Rev. at p. 65.

but the actual decree approved by the Court in that case, as our Circuit Court aptly pointed out in the *Bowman* Case (382 F.2d at p. 328), "requires the kind of 'freedom of choice' plan we have held requisite and embodies standards no more exacting than those we have imposed and sanctioned." And, in the subsequent case of Stell v. Board of Public Education for City of Savannah (C.C.A. 5, 1967) 387 F.2d 486, this same Circuit Court, after referring with approval to its prior opinion in the *Jefferson* Case, approved a freedom-of-choice plan. It seems clear, therefore, that the Court in the *Jefferson* Case did not intend to proscribe freedom of choice, if properly observed, as an acceptable form of desegregation.

Moreover, the Office of Education, H. E. W., issuing its original Guidelines under the provision of Title VI of the Civil Rights Act of 1964, provided that a proper type of freedom-of-choice was an "acceptable type of desegregation". General Statement of Policies Under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools, U. S. Office of Education (April, 1965). It is true that by amendment to such Guidelines, it has added a test of the effectiveness of such freedom-of-choice plans [14] but, even when the plan may have been determined ineffective by such test, the Guidelines do not interdict freedom of choice as a proper form of desegregation but merely provide that the Commissioner "will normally require school officials to take additional actions *as a prerequisite to continued use of a free*

*choice plan,* even as an interim device". (Italics added). While these administrative rulings of the Commissioner of Education are not "determinative" herein, since as Chief Judge Haynsworth observed in the *Bowman* Case (382 F.2d at p. 328) "the definition of constitutional standards controlling the actions of states and their subdivisions is peculiarly a judicial function",[15] nonetheless it is a matter for "respectful consideration" on this issue that administrative officials charged with the application of Title VI have approved as an acceptable form of desegregation a proper fredom-of-choice plan.

■ As a matter of fact, this proceeding presents no new issue to the Courts of this District. It is merely the latest in the series of some fifteen prior cases, raising the same issues and calling for appropriate remedy.[16] Several of these cases arose, and concerned the operation of schools in school districts contiguous to the one involved herein. In all these cases, the decrees have approved freedom-of-choice plans, conforming to the standards enumerated in the *Bowman* and prior cases of this Circuit for acceptable plans of desegregation. As the Court observed in Stell v. Board of Public Education, supra, 387 F.2d at p. 492, there is "great benefit to all concerned in maintaining as high a degree of uniformity as is possible in the plans (of desegregation) as finally approved for the many school districts" in a State. To deny to the defendant the right to operate under a freedom-of-choice plan conforming to these standards which the defendant has

14. For the supposed legal justification of such test, see note 113, 53 Va.Law Rev., 63–4; 55 Georgetown L.J. 333–5.

15. To the same effect, Clark v. Board of Education of Little Rock Sch. Dist. (C. C.A.8, 1967) 374 F.2d 569, 570–571.

16. See, for instance, Adams v. School District No. 5, Orangeburg County, S.C. (D. C.S.C., 1967) 271 F.Supp. 579; Whittenberg v. Greenville County School District, Civil Action No. 4396, ——, filed March 10, 1967, unreported; Brown v. School District No. 20, Charleston, South Carolina (D.C.S.C., 1963) 226 F.Supp. 819, aff. 328 F.2d 618 (C.C.A.4); Stanley v. Darlington County School District, Civil Action No. 7729; Randall v. Sumter School District Number 2, Sumter, S.C. (D.C.S.C., 1965) 241 F.Supp. 787; Brunson v. Board of Tr. of Sch. Dist. No. 1 of Clarendon Co., S.C. (D.C.S.C., 1967) 271 F.Supp. 586; United States of America, etc. v. School District No. 1, Lexington County, Civil Action No. 66–96, (unreported) filed February 6, 1968.

agreed to do in open court—would be to require of it more than was required of all other school districts in similar cases in this State, a result that should, if possible, be avoided.

■ Even those judicial and academic critics who dislike freedom-of-choice as a permanently "acceptable device" for achieving the desegregation of public schools recognize and concede its efficacy and constitutional legality as an interim or transitional solution to the problem. 53 Va.Law Rev. 66; dissenting opinion, Bradley v. School Board, supra, 345 F.2d at p. 324; Singleton v. Jackson Municipal Separate School Dist. (C.C.A.5, 1966) 355 F.2d 865, 871; Kemp v. Beasley (C.C.A.8, 1965) 352 F.2d 14.[17] It is not necessary in this case to determine whether freedom-of-choice is transitional or whether its continuing approval will depend on the amount of integregation it effects. A real freedom-of-choice plan, formulated along the lines set forth in the *Bowman* Case, has not been tried in this school district. It goes considerably beyond any plan heretofore followed by this district. Its adoption should materially increase the tempo of desegregation in the district. Similar to the treatment accorded other school districts in this

State, the defendant district should be given the right to inaugurate and "experiment" with such a plan. Whether it may be deemed a permanent plan for desegregation or merely a transitional step can best be determined as the actual results of such plan are examined and evaluated periodically by this Court.

Of course, approval of a freedom-of-choice plan is conditioned upon the observance of such plan in good faith, without harassment or intimidation. Failure by the defendant to observe the terms of the plan in good faith may very properly call for the relief granted in Coppedge v. Franklin County Bd. of Education (D.C.N.C., 1967) 273 F.Supp. 289, and similar cases in this Circuit.[18] The plaintiff, in his argument filed herein, however, does not predicate his objection to freedom-of-choice upon any claim of want of good faith, harassment or intimidation in administering prior freedom-of-choice plans or the likelihood of such improper conduct in carrying out any new freedom-of-choice plan. Should such issue arise this Court will not hesitate to take appropriate steps, proportioned to the peculiar circumstances of the case, to sustain the constitutional rights of the students and patrons of defendant school district.[19]

17. "Even though the 'freedom of choice' has been recognized by the H.E.W. regulations as one method of achieving integration and has also been recognized and approved by some court decisions, it is still only in the experimental stage and it has not yet been demonstrated that such a method will fully implement the decision of Brown and subsequent cases and the legislative declaration of § 2000d of the Civil Rights Act of 1964. Both decisional and statutory law positively and affirmatively call for school districts set up on a racially nondiscriminatory basis. The 'freedom of choice' plan is treated in the Bradley dissent, supra, as 'only an interim measure, the adequacy of which is unknown.' However, since this method could prove practical in achieving the goal of a nonsegregated school system, it should be allowed to demonstrate its efficacy to afford the constitutional guarantees which plaintiffs are entitled to as a matter of right. We, therefore, find that the 'freedom of choice' plan is a

permissible method at this stage." Kemp v. Beasley, supra, 352 F.2d pp. 20–21.

18. Corbin v. County School Board (E.D. Va., Aug. 29, 1967) 283 F.Supp. 60; Singleton v. Anson County Board of Education (W.D.N.C.) filed March 21, 1968, 283 F.Supp. 895.

19. The admonition of the Court in Kelley v. Altheimer, Arkansas Public School Dist. No. 22, (C.C.A.8, 1967) 378 F.2d 483–490–491, should be observed by all school districts operating under a freedom-of-choice plan. There, the Court, in approving a freedom-of-choice plan, said: "In so holding, we make it clear, however, that we do not give our approval to the manner in which the Altheimer School District has met its responsibilities to desegregate the school system in the past, and we emphasize that if the plan is to be successful in the future, the Board of Education must remove every impediment to the exercise of a meaningful choice by students, and it must take

The real burden of plaintiff's argument against freedom-of-choice in this case centers on the alleged disparity qualitatively between the two schools maintained by the defendant. It is the clear duty of the defendant to remedy, so far as practical, any disparity in facilities, curriculum, etc., between its two school systems. Anything less would be violative of the constitutional rights of the students at such schools. And requirements for correcting any disparities that may exist are appropriate provisions in any decree entered herein. This has been done in a number of cases similar to the present one as a part of decree approving a freedom-of-choice plan. Thus, in Stell v. Board of Public Education, supra, there was unquestionably a disparity between the two school systems involved; otherwise, it would have been pointless and misleading to include Section VI in the approved decree, a section which, in a decree providing for a freedom-of-choice plan, imposed on the school district certain "School Equalization" requirements applicable to the "Inferior Schools * * * heretofore maintained for Negro students". 387 F. 2d at p. 496. Conformable to the decree in that case, a requirement shall be incorporated in the decree herein to the effect that the defendant district shall, so far as reasonably practical, take prompt and proper steps to eliminate such disparity, if any, as exists between the two schools operated by it. Should it be made to appear hereafter that there is such disparity and that the defendant has not sought reasonably to correct it, the Court will consider at such time appropriate relief.

To summarize, I am of opinion that freedom-of-choice as an "acceptable device" for desegregation is not to be denied because there may be a temporary disparity between the two school systems, though the failure to take all practical steps to remove such disparity within a reasonable time may well require other and additional relief.

I am further of opinion that the limited record before me is insufficient to demonstrate that administratively an immediate consolidation of the two schools is practical along the lines proposed by the plaintiff. In the first place, it will be noted that the plaintiff, in his plan of consolidation, groups the two schools in two classifications: The elementary school comprising grades 1 through 8, the high schools, grades 9 through 12. This is different from the present classification of the two schools under which grades 1 to 6 are elementary and grades 7 through 12 high school. It is, also, contrary to modern educational thought or practice.[20] Most school systems have three groupings: elementary school, including 1 through 6 grades, junior high school, including grades 7 through 9, and senior high school, 10 through 12. As a general rule, the 8th grade under any plan of grade classification, falls in the high school grouping. This is true for 830 of the 900-odd school groupings in South Carolina. This matter of grouping is

---

action to eliminate those policies and practices which discourage the desegregation of the school system."

20. See, Morphet, Roe and Reller, Educational Organization and Administration, 2d ed. (Prentice Hall, 1967) p. 319: "The 8–4 plan is the traditional way of organizing education in the United States. * * * Until approximately 1910, this plan was found very generally. Since that time it has lost ground * * *. The 8–4 plan came under attack principally because it was believed that it provided students too limited a program in grades 7–8. The seventh- and eighth-grade students were thought to be at a period of development when a more varied program and one less repetitious of the elementary subjects should be provided."

Elsbree, McNally, Wynn, Elementary Administration and Supervision, 3d ed. (Am.Book Co., 1967), p. 74: "When the upper age limit of compulsory public education was raised, the increased high school enrollments and the greater knowledge of child growth and development brought into question the scope of the eight-year elementary school. As a result, the six year elementary school grew in favor, until today such schools constitute a majority."

not a mere matter of form; it involves in a significant degree the arrangement and selection of faculty. Generally, in an elementary school, the teacher is assigned a class, in a high school, a subject. If the grades in the schools of the district were re-grouped into a new division of classes between elementary and high school, as the plaintiff's plan proposes, a new arrangement of teachers might well be required. Whether such re-arrangement can be easily made can hardly be determined on an abbreviated record such as that here, where none of the administrative problems of such change are exposed to analysis.

Actually, the apparent explanation for the grouping made in plaintiff's proposed plan is the physical accommodations of the two schools. With only 15 classrooms accommodating at the present time an average attendance of 336, the Public School's building would be forced to house 460 students, if the present high schools of the two systems were transferred to such quarters. Since the facilities at the Public School are inadequate for such a consolidation, the plaintiff has proposed his new grouping of classes, changing the high school classification from 7th through 12th grades to 9th through 12th. This, of course, as we have seen, is the grouping in some schools, though generally in conjunction with a junior high school grouping embracing grades 7 and 8—and often 9. But at this point, the question is not which system may meet the needs of a particular school, the issue is whether, on a record as bare as the present one, the Court should arbitrarily determine on a class grouping such as that. Certainly, such a matter justifies more consideration that it has been given in this record.

All in all, it appears to the Court that the proper remedy herein would be the entry of a decree following the pattern established in the Whittenberg Case in this District and that approved in the Bowman Case by our Circuit Court. Such decree would govern the commencement of the school year 1968–9.

Certain special situations should be dealt with in the decree. First, there should be equality of athletic programs in the two schools. Actually, the defendant might well consider the consolidation of the programs at the two schools. Let the defendant accordingly submit such objections, if any, as it may have to such consolidation of athletic programs at the two schools. These objections should be filed within 30 days after entry of the decree herein and will be considered at a hearing thereafter fixed by the Court.

Secondly, the defendant has indicated that it is considering some possible consolidation of its facilities with those of other districts. Such consolidation must be in conformity with the letter and spirit of this Order. See, Betts v. County School Board of Halifax County, Virginia (D.C.Va., 1967) 269 F.Supp. 593, 604.

There should also be included provisions for removing any qualitative disparity that may exist between the two schools.

I am of the opinion that the proposed freedom-of-choice plan, modeled after the up-dated decree in the Whittenberg Case, and enlarged with the additional provisions stated above, will provide an acceptable plan of desegregation herein. Such approval will extend the same treatment to the defendant as that accorded other school districts by Courts in this District. Should the plan prove ineffective in meeting constitutional standards, the plaintiff can apply for further relief and jurisdiction of this cause will be retained for such purpose. In the meantime, let the parties agree upon a decree following the pattern set in the Whittenberg Case and the Bowman Case, with the additions above enumerated, and

It is so ordered.

The foregoing shall constitute Findings of Fact and Conclusions of Law in compliance with Rule 52(a), Rules of Civil Procedure (28 U.S.C.A.).